Patsy AYALA, Donna M. Ayala, Daisy M. Ayala, Dion W. Ayala, By and Through their mother and next of friend, Patsy Ayala; Sylvia Cook, Kyle D. Cook, Jr.; Donna Cook, Angela Cook, Sheryl Lucero Steiner; Travis Lucero, By and Through his mother and next of friend, Sheryl Lucero Steiner; Pamela Mead, Jesse L. Mead, Evan K. Mead; Kraig N. Mead, Brian T. Mead, By and Through their mother and next of friend, Pamela Mead; Shay Tamar Tucker, By and Through her mother and next friend, Joy L. Jameson; Robert James Tucker, Paul Elliot Tucker, Karen Greene; Raymond L. Patch, Personal Representative of the Estates of Loretta M. Patch and Brenda Louise Patch; Rodney Allen Patch, Michael Kent Patch; Stacey Marie Patch, By and Through her conservator and next friend, Raymond L. Patch; Cheryl Sharp Clegg; Wendy I. Sharp, Glen W. Sharp, Amy E. Sharp, James E. Sharp, By and Through their mother and next friend, Cheryl Sharp Clegg; Linda Vetter Granato; Jennifer K. Vetter, Michael T. Vetter, By and Through their mother and next friend, Linda Vetter Granato; Judy Inez Guthrie, Myra Lynn Guthrie; Patricia Kathleen Guthrie, By and Through her mother and next friend, Judy Inez Guthrie, Plaintiffs–Appellants,

v.

UNITED STATES of America, Defendant–Appellee.

No. 94–1093.

United States Court of Appeals, Tenth Circuit.

Feb. 22, 1995.

Rehearing Denied May 9, 1995.

David W. Griffith, Worrell, Griffith, Durrett & Jaynes, P.C., Glenwood Springs, CO (Karen S. Renne, Denver, CO, with him on the briefs), for plaintiffs-appellants.

Robin D. Smith, Trial Atty., Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, DC (Frank W. Hunger, Asst. Atty. Gen., Civil Div., Henry L. Solano, U.S. Atty., Phyllis J. Pyles, Asst. Director, Torts Branch, Civil Div., with him on the briefs), for defendant-appellee.

Before TACHA, Circuit Judge, McWILLIAMS, and BARRETT, Senior Circuit Judges.

TACHA, Circuit Judge.

This case originates from a wrongful death action brought by the families of fifteen miners who were killed in an underground mine explosion near Redstone, Colorado, on April 15, 1981. Dutch Creek No. 1 mine was owned and operated by Mid–Continent Resources, Inc. (Mid–Continent). The case has a long litigation history, including two previous appearances before this court.[1] Of the numerous claims originally filed in this action, only one remains: plaintiffs' claim, against the United States, that the Mine Safety and Health Administration (MSHA) gave negligent technical assistance to Mid–Continent.

In our most recent decision in this case, we held that the technical assistance claim was not barred by the discretionary function exception to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(a). *Ayala v. United States,* 980 F.2d 1342, 1351 (10th Cir. 1992). Accordingly, we remanded the case for determination of the remaining liability issues, including duty, breach, proximate cause, and damages. *Id.* at 1351 n. 5.

On remand, the district court ruled that plaintiffs had not proved the necessary elements of their negligence claim and entered judgment for defendant. *Ayala v. United States,* 846 F.Supp. 1431, 1443 (D.Colo.1993). Specifically, the district court found (1) that MSHA owed no duty of care to plaintiffs; (2)

that even if MSHA owed plaintiffs a duty, MSHA had not breached that duty; and (3) that even if MSHA owed a duty and had breached it, the breach was not the proximate cause of plaintiffs' injuries. *Id.* at 1437–43.

In this appeal, plaintiffs claim that the district court erred by (1) making factual findings inconsistent with findings made in an earlier decision, and (2) concluding that plaintiffs had not proved the elements of a negligence claim. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

*Factual Background*

Mid–Continent used a self-propelled continuous miner in Dutch Creek No. 1 to cut into a seam of coal. As the mechanical continuous miner moved forward, it occasionally encountered large pockets of highly explosive methane gas. On such occasions, the area of the tunnel surrounding the continuous miner filled with methane gas. MSHA regulations require that all electrical equipment automatically deenergize when the methane content in an underground tunnel reaches a level of two percent or greater. 30 C.F.R. § 27.22. Automatic deenergization prevents the electrical equipment from sparking, which could ignite the gas and result in an explosion. According to MSHA regulations, only the main power circuit and the methane monitor circuit should remain energized when the methane monitor triggers deenergization.

In June 1978, Mid–Continent ordered add-on lighting packages for installation on their continuous miners. Mid–Continent was installing these add-on lighting packages to comply with new MSHA illumination standards. Installation of the lights was a field modification of underground mining equipment. MSHA inspectors must approve and inspect a field modification prior to a mine operator's use of the modified equipment. *See* 30 C.F.R. § 26.19. As a result, MSHA

---

1. Because the factual background and procedural history of this case have been set out at length in other reported opinions, we recite only those facts necessary to our decision here. The previous decisions rendered in this case are, in chronological order: *Ayala v. Joy Mfg. Co.,* 580 F.Supp. 521 (D.Colo.1984) (*Ayala I*); *Ayala v. Joy Mfg. Co.,* 610 F.Supp. 86 (D.Colo.1985) (*Aya-*

*la II*); *Ayala v. Joy Mfg. Co.,* 877 F.2d 846 (10th Cir.1989) (*Ayala III*), rev'g, 610 F.Supp. 86; *Ayala v. United States,* 771 F.Supp. 1097 (D.Colo. 1991) (*Ayala IV*); *Ayala v. United States,* 980 F.2d 1342 (10th Cir.1992) (*Ayala V*), rev'g, 771 F.Supp. 1097; *Ayala v. United States,* 846 F.Supp. 1431 (D.Colo.1993) (*Ayala VI*).

mine inspector Jack Marshall visited Dutch Creek No. 1 on June 9, 1978 to assist Mid-Continent engineer Brad Bourquin in revising Mid-Continent's application for approval of the field modification. After assisting Bourquin with the add-on light installation, Marshall prepared to leave the mine. As Marshall was leaving, Bourquin asked him where to connect the add-on lights to the power supply. Marshall indicated that the connection should be made below the main circuit breaker. After Marshall left, Bourquin drew a wiring diagram showing the power connection directly below the main circuit breaker but above the methane monitor. Mid-Continent installed the lights according to Bourquin's diagram. Consequently, the add-on lights were not automatically deenergized by the methane monitor when the methane concentration exceeded two percent.

Mid-Continent made no additional modifications to the lights until nine days before the explosion. At that time, a new cover plate was installed with a light switch allowing the lights to be turned on and off manually. The cover plate was installed with a wire pinched in the flange of the cover plate, leaving an opening in excess of 0.015 inch. MSHA regulations limit the acceptable size of such an opening to 0.004 inch.

MSHA's post-explosion investigators concluded that one of the miners had manually switched off the light on the continuous miner after the methane monitor had deenergized the other electrical equipment in the tunnel. Use of the switch caused an intense arc inside the explosion-proof compartment, which ignited the methane that had entered the compartment. The fire in the compartment escaped through the opening in the flange of the cover plate and ignited the methane in the mine, thereby causing the explosion.

According to plaintiffs, if the lights had been automatically deenergized by the methane monitor, the manual light switch would not have been used. The lights did not deenergize because they were wired to the power source above the methane monitor, which, plaintiffs allege, was a direct result of Marshall's response to Bourquin's question.

*Inconsistent Factual Findings*

Plaintiffs first contend that the district court abused its discretion by making factual findings in *Ayala VI* inconsistent with its findings in *Ayala IV*. Plaintiffs apparently believe that the law of the case doctrine precludes revision of the district court's findings on remand. We disagree.

■ The law of the case doctrine applies only to rules of law decided in the same case. *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1553 (10th Cir.1991), *cert. denied*, 504 U.S. 910, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992). Plaintiffs admit that the doctrine does not prohibit reconsideration of the district court's prior factual findings. *See United States v. Carson*, 793 F.2d 1141, 1147 (10th Cir.), *cert. denied*, 479 U.S. 914, 107 S.Ct. 315, 93 L.Ed.2d 289 (1986). Nonetheless, plaintiffs argue that a district court "abuses its discretion when, while pretending to interpret its original findings, it issues new findings that are not consistent with the original findings." But plaintiffs cite no authority for this argument. Thus, we review the district court's factual findings in *Ayala VI* only for clear error. *Sangre de Cristo Dev. Co. v. United States*, 932 F.2d 891, 897 (10th Cir.1991), *cert. denied*, 503 U.S. 1004, 112 S.Ct. 1760, 118 L.Ed.2d 423 (1992). After reviewing the record, we conclude that the district court's factual findings are not clearly erroneous.

*Duty of Care*

■ Plaintiffs' claim is predicated on the United States' waiver of sovereign immunity under the FTCA. Pursuant to the FTCA, the United States is liable in tort claims "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, "in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b). *See Franklin v. United States*, 992 F.2d 1492, 1495 (10th Cir.1993). Even if specific behavior is statutorily required of a federal employee, the government is not liable under the FTCA unless state law recognizes a comparable liability for private persons. *Zabala Clemente v. United States*, 567 F.2d 1140, 1149 (1st

Cir.1977), *cert. denied*, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978). We therefore look to the law of the state in which the alleged tortious activity occurred to resolve questions of liability under the FTCA. *Franklin*, 992 F.2d at 1495. We review the district court's determinations of state law de novo. *Id.*

According to Colorado law, the elements of a negligence claim are that (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, and (3) the breach proximately caused the plaintiff's injury. *Casebolt v. Cowan*, 829 P.2d 352, 356 (Colo.1992). The threshold question in any negligence action is therefore "whether the defendant owed a legal duty to protect the plaintiff against injury." *Connes v. Molalla Transp. Sys., Inc.*, 831 P.2d 1316, 1320 (Colo. 1992). Whether such a duty exists is a question of law to be determined by the court. *Id.*

The source of a legal duty may be either a legislative enactment or the common law. *Board of County Comm'rs v. Moreland*, 764 P.2d 812, 816 (Colo.1988). In this case, plaintiffs cite no Colorado statute imposing a duty of care upon a party giving technical assistance to another, so we must examine Colorado common law to determine whether MSHA owed a duty to plaintiffs under these circumstances.

Plaintiffs advance two arguments to support their contention that Colorado law imposes a duty of care on MSHA when it provides technical assistance to mine operators. Plaintiffs first contend that MSHA owed them a duty of care because it created an unreasonable risk of harm. Alternatively, plaintiffs argue that under the good samaritan doctrine MSHA assumed a duty of care when it provided technical assistance to Mid–Continent. We address plaintiffs' arguments in order.

Although no Colorado court has imposed a duty of care on a provider of technical assistance, plaintiffs argue that general tort principles require us to conclude that MSHA owed a legal duty to plaintiffs. "A court's conclusion that a duty does or does not exist is 'an expression of the sum total of those considerations of policy which lead the law to say the plaintiff is [or is not] entitled to protection.'" *University of Denver v. Whitlock*, 744 P.2d 54, 57 (Colo.1987) (quoting W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 53, at 358 (5th ed. 1984)). The factors that a court must consider when determining whether a duty exists include "the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden upon the actor." *Id.* (quoting *Smith v. City & County of Denver*, 726 P.2d 1125, 1127 (Colo.1986)); *accord Connes*, 831 P.2d at 1320; *Casebolt*, 829 P.2d at 356; *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 46 (Colo.1987). This list is not exhaustive; courts should also take into account "other factors that may become relevant based upon the competing individual, public and social interests implicated in the facts of each case." *University of Denver*, 744 P.2d at 57. Moreover, "[n]o one factor is controlling, and the question of whether a duty should be imposed in a particular case is essentially one of fairness under contemporary standards—whether reasonable persons would recognize a duty and agree that it exists." *Taco Bell*, 744 P.2d at 46.

These factors lead us to conclude that MSHA owes no duty of care to mine operators in its provision of technical assistance. We recognize that the potential damage involved here is great: The risk of death and serious injury in the event of a methane explosion is quite high. We also recognize that Dutch Creek No. 1 presented a particularly high risk for such an explosion. That MSHA's technical assistance to Mid–Continent would lead to a methane explosion, however, was largely unforeseeable. Marshall, the MSHA mine inspector, could not have foreseen that Bourquin would prepare a separate wiring diagram without submitting that diagram to MSHA with Mid–Continent's revised application. And even if it was foreseeable that Marshall's technical advice would result in Bourquin's incorrect diagram, the subsequent chain of events was not foreseeable. Marshall could not have foreseen that

Mid–Continent would later install a manual on-off switch and that, when installing the switch, an opening would be left to the explosion-proof compartment large enough to allow the migration of methane gas. Thus, the actual events that led to the explosion were not foreseeable at the time Marshall answered Bourquin's question. Moreover, any foreseeability of risk in this case is substantially outweighed by the social utility of the actor's conduct; MSHA's technical assistance to mine operators in complying with safety regulations is of great value to both mine operators and miners.

The consequences of imposing a duty on MSHA—which would place the burden of guarding against injury on the agency—also counsel against imposition of a duty here. Congress enacted the Federal Mine Safety and Health Act of 1977 to improve the "working conditions and practices in the Nation's ... mines in order to prevent death and serious physical harm ... in such mines." 30 U.S.C. § 801(c). MSHA was created to carry out the provisions of the Act. 29 U.S.C. § 557a. MSHA's statutory duties include "provid[ing] technical assistance to operators ... [to] improv[e] the ... safety conditions ... in ... mines." 30 U.S.C. § 952(b). But mine operators retain the primary responsibility for safety in their mines. Id. § 801(e). Imposing a duty of care on MSHA when it provides technical assistance would, in effect, shift the responsibility for safety away from operators and onto MSHA. Despite plaintiffs' argument to the contrary, we do not think that MSHA substitutes itself for the mine operator when it provides technical assistance to operators. See Myers v. United States, 17 F.3d 890, 903 (6th Cir.1994) (stating that holding the government liable for undertaking to fulfill a duty owed by an operator to its miners would require the court "to ignore [the] plain language" of 30 U.S.C. § 801).

Congress's clear intention that operators remain primarily responsible for mine safety is a particularly important consideration under Colorado law. In the absence of clear legislative intent to create a civil remedy, the Colorado Supreme Court has been unwilling to impose civil liability on actors whose obligations are imposed by statute. See Moreland, 764 P.2d at 817 (even if building code imposed an obligation on county to require compliance with the code, plaintiff had no civil remedy for damages resulting from the breach of such obligation); Quintano v. Indus. Comm'n, 178 Colo. 131, 495 P.2d 1137, 1139 (1972) (refusing to infer legislative intent to create a civil remedy from the enactment of a statute creating an industrial commission); cf. State v. Moldovan, 842 P.2d 220, 228 (Colo.1992) (legislative scheme expressed an intent to create a private tort remedy for highway motorists injured due to the failure of the Division of Highways to maintain a fence adjacent to the highway).[2] For all of these reasons, we conclude that Colorado would not impose a duty of care upon MSHA in its provision of technical assistance to mine operators.

**■■■** Plaintiffs next argue that the good samaritan (or assumed duty) doctrine dictates that MSHA owed a legal duty when it rendered technical assistance to Mid–Continent. Under the assumed duty doctrine, "a party may assume duties of care by voluntarily undertaking to render a service." Jefferson County Sch. Dist. R–1 v. Justus, 725 P.2d 767, 770 (Colo.1986). The Supreme Court of Colorado originally adopted this doctrine in Lester v. Marshall, 143 Colo. 189, 352 P.2d 786, 791 (1960). More recently, the court reaffirmed the doctrine in Justus, restating the doctrine in language from the Restatement (Second) of Torts:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or

---

2. We recognize that the FTCA imposes liability "to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, and that these Colorado cases concern governmental, not private, actors. We nevertheless find these cases persuasive because they concern the duty of parties acting pursuant to a legislatively imposed obligation.

(b) the harm is suffered because of the other's reliance upon the undertaking.

*Justus,* 725 P.2d at 770 (quoting *Restatement (Second) of Torts* § 323 (1965)). The *Justus* court further stated that a determination that a defendant assumed a duty to a plaintiff is

predicated on two factual findings. A plaintiff must first show that the defendant, either through its affirmative acts or through a promise to act, undertook to render a service that was reasonably calculated to prevent the type of harm that befell the plaintiff.... Second, a plaintiff must also show either that he relied on the defendant to perform the service or that defendant's undertaking increased plaintiff's risk.

*Justus,* 725 P.2d at 771 (footnote omitted). Under Colorado law, a party who has undertaken a duty pursuant to the good samaritan doctrine may also be liable to third persons who rely on the undertaking. *DeCaire v. Public Serv. Co.,* 173 Colo. 402, 479 P.2d 964, 967 (1971) (adopting *Restatement (Second) of Torts* § 324A).

In *Justus,* a six-year-old student sued a school district for damages stemming from injuries he sustained when he was struck by an automobile while riding his bicycle home from school. *Justus,* 725 P.2d at 768. The school district maintained that it had no duty to protect students from harm off school premises. *Id.* at 769. The plaintiff's school had prepared and distributed a handbook of school rules and regulations, which included a rule prohibiting children of plaintiff's grade from riding a bicycle to or from school. The school also placed teachers in front of the school at the end of each school day to enforce the travel rules promulgated in the handbook. Under these circumstances, the court held that the school district may have assumed a duty to enforce a rule which would have prevented plaintiff's injuries. *Id.* at 772.

The case at bar is distinguishable from *Justus.* In *Justus,* the question was whether the school district voluntarily assumed duties over and above those required by law. 725 P.2d at 771. Here, in contrast, MSHA was compelled by statute to fulfill the obligation at issue. The Supreme Court of Colorado has explicitly noted in a decision subsequent to *Justus* that "action taken to comply with legislative requirements can[not] properly be characterized as voluntarily assumed." *Moreland,* 764 P.2d at 821 n. 14. Thus, assumption of duty analysis is inappropriate for actions taken pursuant to a legislative mandate.

MSHA is required to provide technical assistance to mine operators "to the greatest extent possible." 30 U.S.C. § 952(b). Marshall's assistance to Mid–Continent was therefore "action taken to comply with [a] legislative requirement[ ]." [3] *See Moreland,* 764 P.2d at 821 n. 14. In our view, Colorado would not apply the good samaritan doctrine to MSHA's conduct in this case.[4]

Moreover, even if Colorado applied the assumed duty doctrine to legislatively mandated conduct, at least one of the two factual predicates required by the doctrine are not present here. The district court made no finding with respect to the first factual predicate—whether MSHA affirmatively undertook to render a service to plaintiffs—so we will assume the finding was made favorably to plaintiffs. But the second

---

**3.** Plaintiffs incorrectly assert that this court has already decided this issue. *See Ayala V,* 980 F.2d at 1349. We specifically stated in that opinion that our analysis and holding were limited to whether Marshall's actions were shielded by the discretionary function exception to the FTCA. *Id.* at 1351 n. 5.

**4.** Our conclusion is further supported by a subsequently enacted Colorado statute that limits the assumed duty doctrine:

[A] person shall not be deemed to have assumed a duty of care where none otherwise existed when he performs a service or an act of

assistance, without compensation or expectation of compensation, for the benefit of another person, or adopts or enforces a policy or a regulation to protect another person's health or safety.... Such performance of a service or ... adoption or enforcement of a policy or regulation for the protection of another person's health or safety shall not create any duty of care with respect to a third person.

Colo.Rev.Stat. § 13–21–116(2)(a) (Supp.1994). Although this statute does not control this case, it is a persuasive reflection of the evolution of Colorado law.

finding—reliance—was expressly found in defendant's favor: "[I]t was unreasonable for Borquin [sic] to rely on Marshall's single instruction." *Ayala VI*, 846 F.Supp. at 1440.

We review a factual finding by the district court under the clearly erroneous standard. *Sangre de Cristo Dev. Co.*, 932 F.2d at 897. Our review of the record reveals that, when he provided the technical assistance at issue, Marshall was assisting Bourquin in revising Mid–Continent's application for field modification of equipment. Bourquin knew that Marshall was not empowered to approve the application and that the revised application had to be submitted to MSHA's district office for approval. Bourquin nonetheless prepared a separate wiring diagram without including it with the revised application. In light of these circumstances, the district court's finding that it was unreasonable for Bourquin to rely on Marshall's comment is not clearly erroneous. *See Myers*, 17 F.3d at 904 (holding that "the good samaritan doctrine will only apply against the government in the presence of reasonable, justifiable reliance").[5]

### Conclusion

We find that, under Colorado law, MSHA owed no duty of care to plaintiffs. Consequently, it is unnecessary to examine plaintiffs' claims relating to breach and proximate cause. The judgment of the district court is **AFFIRMED.**

---

5. Plaintiffs do not argue that MSHA's action increased the risk to the miners. Such an argument would be futile here because plaintiffs could not show that Marshall's comment increased the risk of injury to the miners over what it would have been had Marshall done nothing at all. *See Myers*, 17 F.3d at 903.